[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 756 
On June 5, 1981, Clarence Womack was indicted for the capital offense of murdering Arthur D. Bullock, the proprietor of the City Curb Market located in Montgomery, Alabama, by shooting him with a pistol, during a robbery in the first degree, in violation of § 13A-5-31 (a)(2), Code of Alabama, 1975.[1]
The jury found the appellant "guilty of the capital offense as charged in the indictment." Following a separate sentencing hearing, the jury recommended the trial judge "fix punishment at death."
As required by § 13A-5-47, Code of Alabama, 1975, the trial judge entered specific written findings concerning the existence of any aggravating circumstances enumerated in §13A-5-49 and of any mitigating circumstances enumerated in §13A-5-51 and § 13A-5-52 and his written findings of fact. After weighing the aggravating and mitigating circumstances applicable to this case, the trial judge accepted the jury's recommendation and sentenced the appellant to death.[2]
The first witness for the state was Dora Helms, who, on February 2, 1981, lived a block away from the City Curb Market. She testified she had known the deceased, Arthur Bullock, for ten years. On February 2, 1981, Mrs. Helms went to the City Curb Market and purchased some groceries from Mr. Bullock. When she returned home, a friend of the family's, Mattie Hunt, was there. Mrs. Hunt soon left the house to go to the City Curb Market. She returned with a six pack of beer. Mrs. Helms then sent her eight year old daughter, Demetrius, to the City Curb Market for a pack of cigarettes. Demetrius returned a few minutes later without the cigarettes because she was unable to find Mr. Bullock. Mrs. Helms became suspicious because she knew Mr. Bullock always locked the store when he was away, even for a few minutes. She then walked outside and saw the police arriving at the City Curb Market. Mrs. Helms went back inside, turned on the radio, and learned that Mr. Bullock had been killed.
Mattie Hunt testified that on February 2, 1981, sometime after 11:00 a.m., she went to the City Curb Market to purchase a six pack of beer. As she was leaving the store, the appellant came in and asked Mr. Bullock for a pack of cigarettes and some matches. She left and went back to the Helms' home to watch television. Mrs. Hunt was there when Mrs. Helms sent her daughter to the City Curb Market and when Demetrius returned saying she couldn't find Mr. Bullock. She went outside to see what was going on when she heard the police sirens.
Mrs. Hunt testified she picked the appellant out of a photographic line-up and also *Page 757 
a live line-up. She also made an in-court identification of the appellant.
James Reffin testified he was employed as a route salesman for the Flowers Baking Company on February 2, 1981. Sometime between 11:30 a.m. and 12:00, he was making a delivery to the Pricebreaker Grocery Store, which is located in the same block as the City Curb Market. While he was there, a man came in and following a conversation with him, the two went to the City Curb Market and found Mr. Bullock lying on the floor behind the counter. There was blood on Mr. Bullock and on the floor and he appeared to be dead. The two men went back to the Pricebreaker and called the police.
Beverly Rambo, a corporal with the Montgomery Police Department Investigative Division, testified she received a call to go to the City Curb Market on February 2, 1981, at approximately 11:55 a.m. When she arrived there, she found Mr. Bullock lying on the floor with what appeared to be an exit wound out of the right side of his neck. She notified headquarters of what she had found, secured the scene and turned it over to the evidence technician, Tommy Shanks, when he arrived.
Lawrence Rutland was employed in the Robbery-Homicide Unit of the Montgomery Police Department on February 2, 1981. When he arrived at City Curb Market, he found Mr. Bullock lying on the floor behind the counter with a gunshot wound to the neck and powder burns on his jaws and cheek. Rutland followed the ambulance to the morgue and identified the body as being that of Arthur Bullock, whom he had known for several years because he had responded to calls at the City Curb Market in the past.
Lonnie Ray Hardin testified he is employed by the Department of Forensic Sciences and that he had brought with him evidence, in the Bullock case, which had been submitted to him as a custodian of the Department of Forensic Sciences.
T.R. Shanks testified he was an evidence technician with the Montgomery Police Department on February 2, 1981. When he arrived at the crime scene, he searched for and collected evidence, took pictures of the store and checked for fingerprints. He found a spent bullet at the scene, which was later determined to be a .32 caliber bullet. To the best of his knowledge, the weapon used to kill Mr. Bullock had not been found.
Dr. Thomas Gilchrist testified that he is a forensic pathologist employed by the Department of Forensic Sciences and that he performed the autopsy on the body of Arthur Bullock on February 2, 1981. He determined that the gun used to shoot Mr. Bullock had been fired at a very close range because of the presence of powder residue found around the wound and on the clothes of the victim. In his opinion, the cause of Mr. Bullock's death was due to a gunshot wound to the neck.
Robert Bullock, the son of the deceased, testified that his father kept approximately $150 to $200 operating money in the store and several hundred dollars cash in his sock. After conducting an inventory, Bullock determined that some money was missing.
Lonnie Ray Hardin was recalled by the State and testified he is a firearms and tool mark coordinator with the Department of Forensic Sciences. He examined the bullet found at the crime scene to determine the caliber of the bullet and, if possible, what particular firearm it had been fired through. After examination, he determined the bullet was a .32 caliber. He further testified that this bullet was fired through the same gun that was later used to shoot Mr. Clovis Hitson during an unrelated robbery. However, the weapon used in both these cases has not been recovered.
Rex Hussey Jones (also known as Black Bubba), an inmate at Holman Prison, testified that at approximately 2:30 p.m. on February 2, 1981, he saw the appellant and Charles Johnson (also known as "Nanny Goat") at the corner of Goode and Early Streets. The three had a conversation about getting high.
The appellant told Jones that he and Johnson had been on "a lick" at the City Curb Market. Jones asked the appellant *Page 758 
how much money they got and he replied, "[T]he bitch wouldn't give no money." (R. 553) so "I had to shoot the bitch in the face." (R. 553). Johnson told Jones that he didn't think anyone saw them because he was bent over as he ran to prevent the pistol from falling out of his pants.
At this point, Jones and the appellant went to the parole officer together. Then the appellant, Jones, Johnson and Neil Martin went to Trenholm Court to "shoot dope." While they were at the dope house, Jones saw a pistol on both the appellant and Johnson. The appellant had a dark pistol; however, Jones had seen him with a light colored pistol on other previous occasions.
Jones testified he was serving a term in prison for robbery, and had pled guilty to four other robberies, but had not yet been sentenced. He further testified that he had not been promised anything in return for his testimony.
This witness said Neil Martin told him he was going to get out of this mess in some way. Martin asked Jones to burn him on the arm with a cigarette, which he did, so he could say police had burned him.
R.T. Ward, a corporal in the Robbery-Homicide Division of the Montgomery Police Department, testified he took the appellant's statement on the night of February 7, 1981. Prior to taking the appellant's statement, Ward read him his Miranda rights. The appellant told Ward he had an eleventh grade education and understood what had been read to him, but refused to sign the "rights form." Officer Martha Cochran was present when Ward read the appellant's rights and during the time the statement was taken.
Ward said the appellant did not appear to be under the influence of drugs or alcohol at the time, and he never requested an attorney or asked to remain silent. No threats or promises or other inducements were made, and no violence was used in order to get the appellant to make a statement.
Ward informed the appellant that he had been picked out of a line-up by a witness, and the police had received other information indicating the appellant and Johnson were involved in the Bullock case. At this point, the appellant gave an oral statement to Ward, who wrote it down and then typed it. Ward then asked the appellant if the statement was correct. He replied that it was, and signed his name to the statement in the presence of four other officers. The appellant's statement reads as follows: (Volume IV, p. 640).
 "Monday me and Nanny-Goat was walking over on Jeff Davis Avenue and Nanny said, let's get the man's money. And we was right at the City Curb, so I knew what store he was talking about. We went into the store and walked around until this woman that was in there left. I asked the man at the counter for some cigarettes and matches. The man gave me a pack of Kool cigarettes and some matches. I paid him, and that's when Nanny pulled the pistol and told the man that this was a stickup. The man turned around and started reaching under the counter, and Nanny shot him. I ran out the door and went home. I don't know where Nanny went."
The State then rested and the trial judge denied the defense's motion to exclude the evidence and the motion for a directed verdict.
The first witness for the defendant was Neil Martin, who testified he knew the appellant, Rex Jones, and Charles Johnson but that he did not see the appellant or Rex Jones on the afternoon of February 2, 1981. He told the court that Officer Ward had burned his arm with a cigarette. He stated he is an inmate in Holman Prison serving three consecutive life sentences. Martin testified he sent letters concerning this case to defense attorney Maurice Bell and the District Attorney, Jimmy Evans, in the summer of 1981.
While Martin was in the city jail, he saw Charles Johnson with Officers Ward and Carmichael. Johnson looked like he had been beaten.
Rex Jones told Martin he had been promised lighter sentences if he would agree to *Page 759 
testify against the appellant. The witness invoked his Fifth Amendment privilege in response to many questions.
Pauline Eubanks testified she is the Circuit Clerk of Montgomery County, Alabama, and the records show that Rex Jones pled guilty to four charges of robbery in the first degree. Each of those cases has been continued for sentencing.
The appellant testified he had been convicted of burglary, grand larceny and robbery and had spent a number of years in the penitentiary. He was paroled in March of 1979, and since that time had been working as a laborer.
He stated he quit school in the sixth grade and was not able to read nor write very well.
On February 2, 1981, the appellant did not go to work because there was ice on the ground. That morning he got up around 8:00 a.m. and went to pay his rent. He then went to Smiley Court and ran into Charles Johnson and two "dudes" named Junior and Red. They all smoked a joint. Then he and Johnson went to his mother's house at Young-Forte Village and had a drink. Around 10:30 a.m., the two went to Fanny Hawkins' house where they shot dice and drank. They left her house a little after 12:00 p.m.
On Friday, February 6, 1981, the appellant's mother told him the police were looking for him. Around 3:00 p.m., he went to the police station and turned himself in. When he arrived at the police station, he was not drunk but had been drinking. The police told the appellant they had been informed he killed Mr. Bullock. At this point, Rex Jones was brought in and he told the police the appellant was the one. The appellant denied killing Mr. Bullock and insisted he knew nothing about the murder.
The appellant was questioned for several hours Friday night. He claimed he asked for an attorney but was not allowed to see one. During the interrogation, he was handcuffed to a chair and beaten with his tennis shoes.
The next night the appellant was again questioned for several hours. The police beat and kicked him. He was placed in a line-up and was told he had been identified by a witness. The police did allow him to call his mother but still refused him an attorney. He testified he finally wore down and signed the statement that Officer Ward had already prepared. He denied that he had said anything that was contained in the statement. When he was given the statement to read, he did not read it because he couldn't read. He signed it to prevent any further beatings. The police then took him to find Johnson. When they picked him up, the police beat and kicked Johnson. The appellant later saw Johnson in jail and said his face was swollen and he was unable to walk.
On cross-examination, appellant admitted he did not complain about the beatings until after he had been arrested and indicted for murder. He said he did not request medical attention and there were no visible signs of injury but he was sore.
Maurice Bell testified he is the attorney for the defense and went to see the appellant in jail at the request of the appellant's mother. The appellant told Bell he had been beaten by the police but Bell admitted he did not see any evidence of injury.
Shirley Arndt testified that she is employed as a nurse for the Montgomery County Jail and is the custodian of the medical records for the jail. She did not see the appellant but did attend Johnson.
Johnson complained of chest and groin pains and said his eye was sore. He claimed he had been beaten but Nurse Arndt said he did not appear to have been beaten except for some minor bruises.
Dr. Sanders examined him and treated him for a chest cold and pink eye.
Harry Park testified he was employed by S K Restaurant on February 2, 1981. Rex Jones was also employed there at that time and worked 6:00 a.m. until 2:00 p.m. on February 2, 1981. Park stated he would have known if Jones had left work during that time. *Page 760 
J.B. Andrews testified he is employed by the Montgomery Police Department. He was questioned about the procedures he follows when taking statements. Andrews worked on this case and was the one who conducted the line-ups. He showed Mrs. Hunt fourteen photographs and she picked out the appellant.
Andrews then arranged a live line-up. Each of the individuals had a beard and were dressed alike. Mrs. Hunt again picked the appellant.
Dr. William Sanders testified he is a physician hired by Montgomery County to attend prisoners. He treated Johnson for a chest cold and pink eye and said Johnson possibly may have had a hernia. Dr. Sanders did not see any evidence that Johnson had been beaten.
Thomas Gilkeson testified he was Director of Inmate Records for the Department of Corrections and allowed Dr. Marian Shimbum to examine the appellant's records.
Dr. Marian Shimbum testified she is a psychologist and is employed by the State Board of Corrections at Kilby. She is in charge of evaluation, classification and the placement of new inmates. Based on her examination of the appellant's intelligence test scores, she determined the appellant was mildly mentally retarded. She testified that the appellant was only able to recognize ten letters of the alphabet and only two letters in his name. Based on this information, she did not feel the appellant was able to read.
D.H. Carmichael, an officer with the Montgomery Police Department, testified about his procedures in taking statements. When the appellant came into the police department, Carmichael read him his rights. The appellant seemed to be under the influence of some form of intoxicant but was coherent.
Carmichael was accused of beating the appellant, but on both nights in question he was not working and was at home.
Shirley Arndt was recalled by the defense and testified she treated Neil Martin in the city jail on February 27, 1981 for two burns on his arm.
Charles Edward Cole testified he dates the appellant's sister. He was with the appellant on February 2, 1981, but last saw him around 10:00 a.m.
Annie Ray Womack, the mother of the appellant, testified she saw the appellant at 9:30 or 10:00 a.m. and then again at 1:30 or 2:00 p.m.
William Morgan Harris testified he was employed as a supervisor of the jail and is the custodian of the records. He testified as to the times when the appellant and Jones were removed from their cells.
At this time, the defense rested and the State put on several rebuttal witnesses.
Eddie Norred testified he was employed by the Montgomery Sheriff's Department as a jail sargeant. He stated that the appellant and Neil Martin were never in the same cell.
Ralph Connor testified he was employed by the Montgomery Police Department. On April 2, 1981, the date of the appellant's preliminary hearing, he was present in the courtroom on an unrelated case. He was seated on the front row along with ten to fifteen officers. He overheard a conversation between the appellant and his attorney, Maurice Bell. Bell asked the appellant if he saw any officers in the courtroom who had beat him. The appellant pointed to Connor and said he was one of them.
Conner testified he did not work on the Bullock case, was in the Crimes against Property Division, not the Crimes against Persons Division, and never saw the appellant before that day.
Martha Cochran, an officer with the Montgomery Police Department, testified she was present when Ward read the appellant his rights and when his statement was taken. She stated no threats, promises or violence were used to persuade the appellant to make his statement. The appellant told them, "I did it but I didn't shoot him. Another person by the name of Nanny Goat did." (R. 1008). *Page 761 
The defense recalled the appellant who testified that he never said Connor beat him.
At the sentencing phase of the trial, Al Smith testified for the State. He is employed by the State Board of Pardons in the Field Office in Montgomery as a probation and parole officer. The appellant had been under his supervision.
The appellant was sentenced to twenty-five years in the penitentiary for robbery in December, 1971. His sentence went into effect in March, 1973 and served time until he was paroled in March, 1979. The appellant was on parole at the time of the offense in question in this case.
According to a classification summary prepared by the Prison Department, the appellant has average intelligence. Smith indicated that the appellant seemed to understand what was said when they had conversations.
The appellant, his mother and his girl friend, Marcella Jackson, all testified and maintained his innocence.
 I
Since the appellant's conviction and sentence were the product of a bifurcated trial, we will deal with the guilt and sentence phases separately.
The only issue raised concerning the guilt phase was whether or not the appellant's statement was properly received into evidence.
Prior to trial, the appellant attempted to have his confession suppressed, alleging that he had been coerced into signing a pre-prepared statement by the police, who he claimed had beaten him.
Officers R.T. Ward and Martha Cochran both testified at the suppression hearing and at the trial that the appellant was given his Miranda rights and he then gave a statement that was reduced to writing by Officer Ward. The two officers stated the appellant's statement was made free of threats, coercion, or offer of reward or other inducement. Officer Ward gave the statement to the appellant to read and he signed it in the presence of our officers, who testified that no threats or promises or other inducements were made to the appellant in order to obtain his signature.
"The voluntariness of a confession, authorizing its admission into evidence, must be determined by the trial judge in the exercise of enlightened discretion . . ." Burks v. State,353 So.2d 539 (Ala.Cr.App. 1977). When conflicting evidence is presented concerning the facts and circumstances surrounding a confession, the trial judge must decide on its admissibility.Hobbs v. State, 401 So.2d 276 (Ala.Cr.App. 1981). The trial court's decision will not be overturned on appeal unless it appears to be palpably contrary to the great weight of evidence or is manifestly wrong. Burks v. State, supra.
The trial judge, after hearing the testimony of the officers and the appellant, ruled the confession was voluntarily and intelligently made and allowed it to go to the jury on its credibility. We hold there was sufficient evidence to support the trial court's findings in this regard and we will not disturb that decision in our review.
Once the confession is admitted into evidence, any controverted testimony for the defendant goes to the jury.Hobbs v. State, supra. The appellant was allowed to present evidence and cross-examine the State's witnesses in an attempt to persuade the jury that his confession was not freely and voluntarily given.
The appellant claims that he could not read and signed the statement without knowing what was contained within it. "While an accused's intelligence and literacy are important factors to be considered . . ., weak intellect or illiteracy alone will not render a confession inadmissible." Hobbs v. State, supra. The appellant told the officers he had an eleventh grade education. When asked whether the statement was correct, he said that it was and signed the statement. The trial court determined that the appellant's level of literacy and intellect did not render his confession inadmissible *Page 762 
and we hold the trial judge did not abuse his discretion in making that decision.
Therefore, we hold that the confession was intelligently and voluntarily made and was properly admitted into evidence.
 II
The Supreme Court of Alabama's decision in Beck v. State,396 So.2d 645 (Ala. 1981) requires this court to review each death sentence:
 ". . . [T]o ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant."
This must be done to ensure that the death penalty is imposed fairly and with uniformity in the State of Alabama. Beck v.State, supra.
The appellant was tried for and convicted of the capital offense of "(2) Robbery or attempts thereof when the victim is intentionally killed by the defendant." § 13A-5-31 (a)(2), Code of Alabama, 1975. The appellant contends he should not receive the death penalty under this statute because he was, in fact, the non-triggerman accomplice.
The United States Supreme Court in Enmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) addressed this issue and examined the historical development of the felony murder doctrine as it applies to capital cases, including legislative statutes, international opinion and jury verdicts. Of the thirty-six jurisdictions which have implemented death penalty statutes, only a small minority (nine) authorize the imposition of the death penalty solely for participation in a robbery in which another robber commits a murder.
 ". . . Eleven states require some culpable mental state with respect to the homicide as a prerequisite to conviction of a crime for which the death penalty is authorized. Of these 11 states, 8 [including Alabama] make knowing, intentional, purposeful, or premeditated killing an element of capital murder." (Bracketed text added).
Enmund v. Florida, supra.
The United States Supreme Court in Beck v. Alabama,447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) stated that:
 ". . . Under the Alabama death penalty statute the requisite intent to kill may not be supplied by the felony-murder doctrine[2]."
They further stated in footnote 2 of that opinion:
 "In Ritter v. State, 375 So.2d 270, 275 (1979), cert. pending [448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133], the Alabama Supreme Court held that the State could not satisfy its burden of proof under the new death penalty statute simply by showing that the defendant intended to commit robbery or even by showing that he should have known that there was a substantial possibility that someone would be killed. Although the State is not required to prove that the defendant was the actual triggerman, it must show that he had a `particularized intent' to kill the victim or that he `sanctioned and facilitated the crime [of intentional killing] so that his culpability is comparable to that of' the actual killer."
Therefore, the death penalty can be imposed upon a non-triggerman accomplice if there is proof of a culpable mental state. Ritter v. State, supra.
We take note that the United States Supreme Court has concluded, after examining legislative enactments and jury decisions, that the Eighth Amendment does not permit the imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Enmund v. Florida, supra.
However, "the accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice *Page 763 
merely in the underlying felony. Ritter v. State, 375 So.2d 270
(Ala. 1979). An accomplice to the intentional killing is one who aids and abets the killing by any assistance rendered through `acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.'" Id. at 274. Ex Parte Raines, 429 So.2d 1111 (Ala. 1982).
The question before this court is whether there is sufficient evidence contained in this record which would prove this appellant had the "particularized intent" to kill.
The appellant contends he was a minor participant in the robbery and did not intend the killing of Mr. Bullock. However, the evidence presented at trial indicates otherwise. The appellant was the one person who could positively be placed at the scene of the crime and he was the person who went into the store and asked Mr. Bullock for the cigarettes and matches.
We can hardly therefore say that the appellant was a minor participant in the robbery. There was also testimony that both the appellant and Johnson had guns on them immediately after the murder, and that this appellant, not Johnson, actually killed the victim. Rex Jones testified that the appellant stated he "had to shoot the bitch in the face."
We thus conclude there was sufficient evidence presented at trial from which the jury could infer that this appellant was prepared to kill, intended to kill, and supported Johnson in the killing of Mr. Bullock, if he was, in fact, not the actual triggerman himself.
The jury was given proper instructions on the "intent to kill requirement." The trial judge charged on the relationship between complicity, aiding and abetting, and intent to kill. He made it clear to the jury that the felony murder doctrine was relevant only to the lesser included offense of non-capital murder, and that there could be no conviction for the capital offense absent a finding beyond a reasonable doubt that the appellant possessed the intent to kill. The existence of the intent to kill was a question of fact for the jury.
We hold that the state proved this appellant had the necessary culpable mental state in Mr. Bullock's murder, and that his conviction of this capital offense should be upheld and that he was properly sentenced to death. Ex Parte Raines,supra.
 III
We are commanded by the Alabama Supreme Court to examine one final issue. This court is required to ". . . [e]xamine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any." Beck v. State, supra.
The Office of the Attorney General by letter dated November 10, 1982, has notified this court that "since the briefs were filed in this case, a stipulation has been filed concerning disposition of the charges that had been pending against co-defendant Charles Johnson. The stipulation, which incorporates a motion to nol pros filed in the Johnson case, indicates that the charges against Johnson have been dismissed, at least for the time being because of insufficient evidence against Johnson."
We recognize it would be difficult to prosecute Johnson for this offense because it was impossible to place Johnson at this crime scene by any known witness. Similar crimes to the one on this appeal are being punished by the death penalty throughout the state. See Ex Parte Raines, supra, and Ex Parte Ritter, supra. We cannot infer that just because the state was unable to make out a proper case against Johnson, that there was insufficient evidence presented during the trial to convict this appellant, Womack.
For the reasons stated above, the appellant's conviction and sentence of death are due to be and the same are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] The Alabama Legislature repealed § 13A-5-31 (a)(2) on July 1, 1981. However, the act provides that the repeal of § 13A-5-31 (a)(2) does not affect the application of preexisting law to conduct occurring before the effective date of the act. Acts 1981, No. 81-178, § 19, 20.
[2] The trial court's judgment of sentence, dated April 30, 1981, is hereto made a part hereof and attached as Appendix A. (Volume 6, R. 1154-1160). *Page 764 
 APPENDIX A JUDGMENT AND SENTENCE OF THE COURT FRIDAY, APRIL 30, 1982 COURT MET PURSUANT TO ADJOURNMENT PRESENT THE HONORABLE WILLIAM R. GORDON, JUDGE PRESIDING
STATE OF ALABAMA
VS. CC-81-861 OFFENSE — MURDER
CLARENCE WOMACK
This day came the State by its District Attorney and came also the defendant in his own proper person and by his attorney, Honorable Maurice Bell, and it appearing to the court that the said Defendant was duly convicted of said offense on a former day of this court, and the said defendant being asked by the court if he had anything to say why the sentence of the law should not now be pronounced upon him, says nothing in bar or preclusion of sentence.
It is therefore considered and adjudged by the court and it is the judgment and sentence of the court that the Sheriff of Montgomery County, Alabama, shall remove the said defendant, Clarence Womack, to the Montgomery County Jail where he, the said Clarence Womack shall remain in custody until the 30th day of June, 1982, and on said day he, the said Clarence Womack shall be removed to the William C. Holman unit of the Prison System of Alabama at Atmore, Alabama, and on said day in strict accordance with the law, the Warden of Holman Prison at Atmore, Alabama shall put the said Clarence Womack to death by causing to pass through the body of said Clarence Womack a current of electricity of sufficient intensity to cause the death of the said Clarence Womack, and that the application and continuance of such current of electricity to pass through the body of the said Clarence Womack until he, the said Clarence Womack is dead.
And it is further ordered by the court that the Clerk of this court shall issue the necessary warrant for the execution of the said Clarence Womack as required by law.
 CIRCUIT COURT FIFTEENTH JUDICIAL CIRCUIT CC-81-861-G
STATE OF ALABAMA, ) )
Plaintiff, ) )
v. ) SENTENCING ORDER )
CLARENCE WOMACK, ) )
Defendant. )
The case of Clarence Womack is presented to the court upon the unanimous recommendation by jury that the death penalty be imposed upon him. This recommendation was made after a separate sentencing hearing which was conducted by the same jury that had previously found the defendant guilty of the capital offense as charged in the indictment. The procedures followed are set out in Alabama Code §§ 13A-5-30 et seq. as modified by the decision in Beck v. State, 396 So.2d 645 (Ala. 1980).
The court ordered and received a pre-sentence report which has been made part of the record in this case. No part of this pre-sentence report has been, or shall be, kept confidential.
The State and the defendant have been given the right to present evidence to the court about any part of the report. The court has considered the pre-sentence report as to the background of the defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The court, however, has made its own independent analysis of the existence or non-existence of aggravating and mitigating circumstances. The court has made its own special application of the facts which the court has heard and carefully reviewed to the enumerated aggravating circumstances and to the mitigating circumstances whether enumerated in § 13A-5-36 or not.
The parties have been given full and ample opportunity to present arguments concerning the existence of aggravating and mitigating circumstances. The court now, in accord with § 13A-5-33 proceeds to enter *Page 765 
written findings of fact summarizing the crime and the defendant's participation therein. The court also proceeds to enter specific written findings concerning the existence or non-existence of aggravating circumstances enumerated in § 13A-5-35, each mitigating circumstance enumerated in § 13A-5-36, and as to any additional mitigating circumstances offered herein.
 SUMMARY OF CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
On February 2, 1981, sometime between the hours of 10:00 a.m. and noon, the defendant, Clarence Womack, together with Charles "Nannygoat" Johnson entered the City Curb, (a small curbside grocery store) located at 222 West Jeff Davis Avenue in Montgomery, Alabama. Charles Johnson has a capital case arising out of the same event pending against him in this circuit.
Either the defendant or Johnson approached the deceased, Mr. Arthur Bullock, who was behind the store counter, pulled a pistol and demanded Bullock's money. The deceased made some motion as if perhaps to reach for a weapon and he was shot. Bullock died from this injury. The defendant and Johnson ran from the store without taking any property. Later that day, the defendant confided these events to Rex Jones, (who subsequently testified against him at the trial in this case.) On February 7, 1981, the defendant gave a written statement to Officer Ward of the Montgomery Police Department in which he confessed the crime.
 ENUMERATED AGGRAVATING CIRCUMSTANCES
The capital offense was committed by a person under sentence of imprisonment. The defendant was serving parole time on his conviction of robbery 1° on October 20, 1971.
The defendant was previously convicted of the offense of robbery on October 20, 1971. The court has considered this offense as a prior conviction of a felony involving the use or threat of violence to the person.
The instant capital offense involves one victim. This offense is not considered by the court to invoke the circumstances set out in § 13A-5-35 (3).
The capital offense was committed while the defendant was engaged in, or was an accomplice in the commission of, or in an attempt to commit a robbery.
Under the evidence the court does not find that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
The capital felony was not committed for pecuniary gain.
The capital felony was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
The court does not find from the evidence that the capital felony was especially heinous, atrocious or cruel.
 MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
The evidence before the court establishes that the defendant does have a significant history of prior criminal activity, including a robbery conviction, two convictions for grand larceny and one conviction for burglary. The capital offense before this court is the defendant's fourth felony conviction.
The capital felony was not committed while the defendant was under the influence of extreme mental or emotional disturbance.
The victim was not a participant in the defendant's conduct and did not consent to the act. The court finds by a preponderance of the evidence that the defendant was a major participant in the capital offense and that he actively participated in the robbery or attempted robbery with full knowledge.
The preponderance of the evidence establishes that the defendant was not under extreme duress at the time of the capital offense.
The preponderance of the evidence further establishes that the defendant was not under the substantial domination of another *Page 766 
person. A preponderance of the evidence convinces this court that the defendant together with his accomplice entered the City Curb with the full intention of robbing the deceased and using whatever force was necessary to cause the deceased to part with his personal property.
The preponderance of the evidence establishes that the defendant did have the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.
The preponderance of the evidence establishes that this capacity was not impaired.
In the opinion of the court, from the preponderance of the evidence presented, the defendant knew full well what he was doing and what he was doing was wrong.
The evidence establishes that the defendant was thirty-one years of age at the time of the capital offense.
In addition to the above enumerated mitigating circumstances the defendant, at the sentence hearing conducted by the court, was given the opportunity to present any further evidence of mitigating circumstances and to make any statement of mitigating circumstances. The defendant, through counsel, only argued that the evidence against him upon which his conviction of the capital offense was based was weak.
The defendant himself upon being given the opportunity to do so made no statement to the court.
 CONCLUSION
With all evidence before the court desired by either party, the court weighed the aggravating and mitigating circumstances and weighs these circumstances against each other.
It is the conclusion of this court that the aggravating circumstances overwhelmingly outweigh the mitigating circumstance. Accordingly, the court accepts the sentence of the jury that the penalty of death be imposed upon Clarence Womack.
 SENTENCING PROCEDURE
The hearing on aggravating and mitigating circumstances to be held by the court was originally set on April 23, 1982. At that time all parties were present with counsel and the court was informed by the Dept. of Parole and Probation that defendant had failed to cooperate in providing any personal history or other information for inclusion in the pre-sentence report. The court at that time continued the hearing until April 30, 1982 upon being advised by counsel that he would insure that defendant cooperated in the further preparation of the pre-sentence report. The court received further information which is included in the pre-sentence report and without objection proceeded to its hearing set on April 30, 1982. Again at that time the defendant was given the opportunity, together with his lawyer, to make any statements to the court to be considered as a mitigating circumstance in this matter. The defendant declined to make any remarks and formal sentence was entered at that time. All parties and counsel were informed that a formal written Order would follow the sentencing.
DONE and ORDERED in chambers this 4th day of May, 1982.
 /s/ William R. Gordon
WILLIAM R. GORDON Circuit Judge
District Attorney
Maurice Bell