TAYLOR, Judge.
Petitioner, Clarence Womack, was indicted and convicted of intentionally killing Arthur Bullock during the course of a robbery, pursuant to § 13A-5-31(a)(2), Code of Alabama 1975. Upon the jury’s recommendation, Womack was sentenced to death. On direct appeal, in Womack v. State, 435 So.2d 754 (Ala.Cr.App.1983), this court affirmed the conviction and sentence. Thereafter, the Alabama Supreme Court affirmed in Ex parte Womack, 435 So.2d 766 (Ala.1983). For a sufficient understanding of the facts in this case, we quote a portion of this case as reported on direct appeal.
“The first witness for the state was Dora Helms, who, on February 2, 1981, lived a block away from the City Curb Market. She testified she had known the deceased, Arthur Bullock, for ten years. On February 2, 1981, Mrs. Helms went to the City Curb Market and purchased some groceries from Mr. Bullock. When she returned home, a friend of the family’s, Mattie Hunt, was there. Mrs. Hunt soon left the house to go to the City Curb Market. She returned with a six pack of beer. Mrs. Helms then sent her eight year old daughter, Demetrius, to the City Curb Market for a pack of cigarettes. Demetrius returned a few minutes later without the cigarettes because she was unable to find Mr. Bullock. Mrs. Helms became suspicious because *42 she knew Mr. Bullock always locked the store when he was away, even for a few minutes. She then walked outside and saw the police arriving at the City Curb Market. Mrs. Helms went back inside, turned on the radio, and learned that Mr. Bullock had been killed.
“Mattie Hunt testified that on February 2, 1981, sometime after 11:00 a.m., she went to the City Curb Market to purchase a six pack of beer. As she was leaving the store, the appellant came in and asked Mr. Bullock for a pack of cigarettes and some matches. She left and went back to the Helms home to watch television. Mrs. Hunt was there when Mrs. Helms sent her daughter to the City Curb Market and when Demetrius returned saying she couldn’t find Mr. Bullock. She went outside to see what was going on when she heard the police sirens.
“Mrs. Hunt testified she picked the appellant out of a photographic line-up and also a live line-up. She also made an in-court identification of the appellant.
“James Reffin testified he was employed as a route salesman for the Flowers Baking Company on February 2, 1981. Sometime between 11:30 a.m. and 12:00, he was making a delivery to the Pricebreaker Grocery Store, which is located in the same block as the City Curb Market. While he was there, a man came in and following a conversation with him, the two went to the City Curb Market and found Mr. Bullock lying on the floor behind the counter. There was blood on Mr. Bullock and on the floor and he appeared to be dead. The two men went back to the Pricebreaker and called the police.
(( * * *
“Rex Hussey Jones (also known as Black Bubba), an inmdte at Holman Prison, testified that at approximately 2:30 p.m. on February 2, 1981, he saw the appellant and Charles Johnson (also known as “Nanny Goat”) at the corner of Goode and Early Streets. The three had a conversation about getting high.
“The appellant told Jones that he and Johnson had been on ‘a lick’ at the City Curb Market. Jones asked the appellant how much money they got and he replied, ‘[T]he bitch wouldn’t give no money.’ ... so T had to shoot the bitch in the face.’ _ Johnson told Jones that he didn’t think anyone saw them because he was bent over as he ran to prevent the pistol from falling out of his pants.
<< * * «
“This witness said Neil Martin told him he was going to get out of this mess in some way. Martin asked Jones to burn him on the arm with a cigarette, which he did, so he could say police had burned him.
“[Corporal R.T.] Ward [of the Montgomery Police Department] informed the appellant that he had been picked out of a line-up by a witness, and the police had received other information indicating the appellant and Johnson were involved in the Bullock case. At this point, the appellant gave an oral statement to Ward, who wrote it down and then typed it. Ward then asked the appellant if the statement was correct. He replied that it was, and signed his name to the statement in the presence of four other officers. The appellant’s statement reads as follows:
“ ‘Monday me and Nanny-Goat was walking over on Jeff Davis Avenue and Nanny said, let’s get the man’s money. And we was right at the City Curb, so I knew what store he was talking about. We went into the store and walked around until this woman that was in there left. I asked the man at the counter for some cigarettes and matches. The man gave me a pack of Kool cigarettes and some matches. I paid him, and that’s when Nanny pulled the pistol and told the man that this was a stickup. The man turned around and started reaching under the counter, and Nanny shot him. I ran out the door and went home. I don’t know where Nanny went.’
a * * *
“The appellant testified he had been convicted of burglary, grand larceny and *43 robbery and had spent a number of years in the penitentiary. He was paroled in March of 1979, and since that time had been working as a laborer.
t( * * *
“At the sentencing phase of the trial, A1 Smith testified for the State. He is employed by the State Board of Pardons in the Field Office in Montgomery as a probation and parole officer. The appellant had been under his supervision.
“The appellant was sentenced to twenty-five years in the penitentiary for robbery in December, 1971. His sentence went into effect in March, 1973 and [he] served time until he was paroled in March, 1979. The appellant was on parole at the time of the offense in question in this case.
“According to a classification summary prepared by the Prison Department, the appellant has average intelligence. Smith indicated that the appellant seemed to understand what was said when they had conversations.”
Having established the factual content of the case, we will now review petitioner’s contentions in his petition for a writ of error coram nobis.
He asserts as grounds for the writ that there is newly discovered evidence, that he was subjected to ineffective assistance of counsel, and that exculpatory evidence was withheld from him at trial.
I
We will first review petitioner’s contention that sufficient new evidence has been presented to warrant a new trial.
Petitioner produced an alleged new witness, Mary Allen. She testified that she was a friend of the appellant’s mother and had seen him grow up and that she would like to help him in any way she could. Mary Allen testified that she went to the Bullock store on the day of the murder. She said that as she approached the store she saw two persons known to her as Chick Bush and Nookie. Nookie was at the door of the store and Chick Bush was sitting in a ear in front. She entered the store, where she purchased a moon pie and a Coke from Mr. Bullock and then proceeded up the street towards Johnson’s Cafe. As she neared Johnson’s Cafe she heard shots, turned around and saw Nookie run from the store with a gun. Nookie got into the car with Chick Bush and they sped away. She stated that Clarence Womack was not at the store. Chick Bush received notoriety from being convicted of a highly publicized convenience store robbery-murder in Montgomery.
Allen did not report these alleged observations to the police at the time. Shortly after this incident she left Montgomery and took up residence in Florida. When she returned to Montgomery, petitioner had been tried and convicted. She first testified at petitioner’s coram nobis hearing.
The record shows that Mary Allen had very poor eyesight. Contrary to her story of going to the medical center near the Bullock store, no record exists that she actually went to the medical center near the Bullock store as she claimed. There was evidence that she had an appointment at Baptist Hospital on the other side of town within an hour of the time she claimed to have been in the Bullock store. Her credibility was left in doubt.
Also appearing as petitioner’s witness at the coram nobis proceeding was a Montgomery attorney, Robert Beno. He testified that while he was representing one Neil Martin in a criminal matter, Martin said something to him regarding the Bullock murder. According to Beno, Martin stated that he (Martin) and Rex Jones had committed the robbery of Mr. Bullock and that Rex Jones was the one who actually shot Mr. Bullock. Mr. Beno came forward with this information, which of course was adverse to his client, at petitioner’s coram nobis hearing after having proceeded correctly to secure permission to testify from the Alabama State Bar.
At the coram nobis hearing Neil Martin appeared as a witness. He had previously given testimony before the grand jury in this case. He had been a defense witness at appellant’s trial, but had refused to answer some questions on constitutional *44 grounds. At the coram nobis hearing he contradicted his grand jury testimony by stating that he was not with Rex Jones. He also denied ever telling Mr. Beno that Rex Jones shot Mr. Bullock, or that he was with Jones when Mr. Bullock was shot. However, later during the hearing, Martin wrote a note to the district attorney saying that his grand jury testimony was the truth.
In order for petitioner to prevail on a writ of error coram nobis based upon newly discovered evidence, he must show that the evidence was not known at trial and that it could not have been discovered through due diligence. Thigpen v. State, 374 So.2d 401 (Ala.Cr.App.), cert. denied, 374 So.2d 406 (Ala.1979); Lewis v. State, 367 So.2d 542 (Ala.Cr.App.1978), cert. denied, 367 So.2d 547 (Ala.1979). The Allen and Beno testimony passes this test.
At a coram nobis hearing, “the trial judge must ‘believe’ the testimony and ... the burden on the petitioner is to submit clear, full, and satisfactory proof of his assertions for relief.” Seibert v. State, 343 So.2d 788 (Ala.1977) (emphasis in original); Williams v. State, 489 So.2d 4 (Ala.Cr.App.1986).
The judge who heard the lengthy coram nobis hearing was also the judge who presided at Womack’s trial. He therefore had personal knowledge of all the testimony from that trial. He was entitled to draw on that knowledge in assessing the credibility of the alleged newly discovered evidence.
Neil Martin’s truth and veracity were impeached because of his repeated contradictions. While we are satisfied that Attorney Beno complied with his duty as an attorney in coming forward with this information, the statements of Martin were lacking in credibility. The testimony of Mary Allen was rebutted and is also lacking in credibility. The trial court obviously disbelieved Martin and Allen.
“To warrant the granting of a new trial on the ground of newly discovered evidence it must appear to the court that the evidence so found, if it had been considered by the jury, would have probably changed the result of the trial.” Haynes v. State, 335 So.2d 203 (Ala.Cr.App.), cert. denied, 335 So.2d 208 (Ala.1976). See also Woodward v. State, 433 So.2d 1198 (Ala.Cr.App.1983) and Cannon v. State, 416 So.2d 1097 (Ala.Cr.App.1982). The jury found the petitioner “guilty of the capital offense as charged in the indictment.”
This court is of the opinion that this “newly discovered evidence” would not have changed the result of Womack’s trial. The trial court correctly denied appellant’s petition.
II
Appellant argues that the prosecution failed to disclose exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires that the prosecution disclose evidence which is favorable to the defendant, if material as to either the defendant’s guilt or his punishment.
Womack claims that several things should have been disclosed to him. He first contends that there existed in the district attorney’s file a plea agreement with witness Rex Jones. The state contends that Jones 'did not know of a sentencing agreement when he testified. In its initial review of Womack’s conviction, this court stated that “... the records show that Rex Jones pled guilty to four charges of robbery in the first degree. Each of those cases has been continued for sentencing.” The trial court record also included a statement from witness Neil Martin that Rex Jones told Martin that “he had been promised lighter sentences if he would agree to testify against the appellant.” Womack v. State, 435 So.2d at 758-59. Womack argues that a plea-bargain agreement must have existed. This testimony was countered, however, by the testimony of Rex Jones himself that he had no knowledge of a plea arrangement. Further, Jones’s attorney, Charles Law, an experienced defense attorney, also testified that Jones had no knowledge of a sentencing agreement when he testified in the Womack trial. There was, therefore, ample evidence *45 from which the trial court could have concluded that no such plea bargain agreement existed at the time Jones testified.
As to the testimony of Neil Martin, the principal problem is to determine what he said at what stage of the proceedings. To the grand jury, it appears that Neil Martin incriminated Womack in the murder of Bullock. Then, at trial, Martin sought to incriminate Rex Jones instead of Wom-ack. At the coram nobis hearing, Martin went both ways. The short factual answer to Womack’s contention is, however, that the testimony before the grand jury incriminated Womack and was not exculpatory. He had no constitutional right to it. Martin seems to have impeached himself as thoroughly as any witness could have.
Appellant next contends that a memorandum in the district attorney’s file should have been disclosed to him. The memorandum concerned statements made by Martin and Jones to Robert Glenn. Appellant acknowledges in his brief that this memorandum would, at best, provide a basis for attempting to impeach these witnesses. No error resulted from its nondisclosure because it failed to meet the test for materiality. Further, there was no reasonable probability that the disclosure of these people’s statements to Robert Glenn would have affected the outcome of the trial.
Appellant next argues that Martin’s and Jones’s initial identification of Ralph Miller as appellant’s accomplice constitutes exculpatory evidence and should have been disclosed to him. This is not exculpatory material under the Brady standard as to Womack.
The appellant makes arguments that other pieces of evidence should have been disclosed as Brady material. The first is a statement by Dora Helms to the police. This statement was substantially similar to her testimony at trial. No error. The second was a phone conversation of one “Willie McQueen” who stated he was present at the murder. However, who “Willie McQueen” is, and what, if anything, he said or saw has never been established. No error. Next, a set of supplementary police reports concerning James Lawrence and Eugene Scott were claimed to be exculpatory. However, the reports simply established that James Lawrence was one of the suspects ruled out by the police investigation and that Eugene Scott was the victim of a crank call to the “Secret Witness” number.
The petitioner has not proven that material exculpatory evidence was withheld from him as required by the United States Supreme Court in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Therefore, no constitutional violation occurred.
Ill
Finally, appellant argues that his trial counsel was ineffective. The standard for effective assistance is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).
“A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
Both requirements of Strickland must be met in order for the defendant to prove a claim of ineffectiveness of counsel.
The petitioner makes the following allegations in support of his claim of ineffective assistance. He argues that his attorney’s testimony as to not noticing any physical injuries to petitioner weakened petitioner’s claim of a coerced confession. This was testimony as to a matter of physical fact. We will not entertain a con *46 tention that a witness should have committed perjury. The evidence of the voluntariness of Womack’s confession was overwhelming. The appellant next alleges that the attorney did not make an “adequate investigation” in order to find out whether “another attorney had visited the appellant” in jail. This attorney, appellant says, might have testified to observing alleged physical injuries. This lawyer testified that he noticed a bump on Womack’s head but none of the other injuries that Womack alleged. Appellant argues that his counsel was deficient when he called the jail’s nurse as a witness. She contradicted appellant’s claim that a confession was beaten out of him. He also argues that calling a police officer as a witness for appellant resulted in reversible error. However, the officer’s testimony as to identification of the appellant by a witness was merely cumulative to evidence of the procedures used with the photographic array and the procedure followed in taking statements. Appellant argues it was error to call, as a witness, another police officer. This officer was present at the jail when the appellant arrived. This witness stated that the appellant had been drinking. The appellant argues tha+- this testimony was detrimental, as it contradicted his claim that his confession was forced. The evidence could have been considered either way. He also argues that his trial counsel erred when he called Rex Jones’s employer to the witness stand because the employer’s testimony established that Rex Jones was somewhere else when the robbery-murder was committed. He argues also that the same error was committed in the calling of Thelma Stafford, the mother of Rex Jones, as a witness.
The appellant argues that his counsel should have called some other “alibi” witnesses. These new witnesses’ testimony would have placed the appellant in the vicinity at the time of the crime and in the company of his accomplice and would not have provided him with an alibi. This testimony would not have been beneficial for the appellant. Neither would the appellant have benefited from the testimony of James Russell Williams, a thrice convicted felon. The appellant hoped Williams would testify that Neil Martin and Rex Jones said they committed a murder. At the coram nobis hearing, Williams testified to the contrary.
The appellant argues that his counsel should have objected to the offer of a prior consistent statement of Mattie Hunt. This testimony concerned identification of the appellant, and was in response to an attack on the identification procedures used by the police department. There is no reasonable probability that the outcome of the trial would have been different if an objection to the offer of this evidence had been made.
Appellant’s final argument is that his counsel should have taken steps to acquire attorney Beno’s testimony implicating Martin and Jones. However, this testimony could only have been used to impeach Martin’s testimony. Martin refused to testify against the appellant. Therefore, it was not needed. In addition, as explained in part I, this testimony was highly unreliable. In order to establish ineffective assistance of counsel, both requirements of Strickland, supra, must be met. In proving prejudice, the petitioner must show that “but for counsel’s unprofessional errors, the result of the proceedings would have been different.” Strickland, 104 S.Ct. at 2068. Appellant’s trial counsel perhaps made some questionable and possibly unorthodox decisions regarding his trial strategy, but all decisions made at trial may be questioned. Hindsight is 20/20. This was particularly noticeable in this case when the trial strategy included counsel’s taking the witness stand in the coram nobis proceeding to swear to his own professional incompetency. The appellant has failed to show that his constitutional right to effective assistance was denied him. We therefore find that no error occurred.
The decision of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.