Samuel Lee Felder was indicted for the intentional killing of Elbert Lee Jackson during the course of a robbery in the first degree, in violation of § 13A-5-40 (a)(2), Code of Alabama 1975. The jury found the *Page 1323 
appellant "guilty as charged in the indictment" and recommended the appellant be sentenced to death. After independently weighing the aggravating and mitigating circumstances of this case, the trial judge accepted the jury's recommendation and sentenced the appellant to death. See Appendix A, hereto attached and made a part hereof.
On the night of April 28, 1982, Elbert Lee Jackson was employed by the Yellow Cab Company and was driving cab No. 7. At approximately 10:15 p.m., Jackson radioed the night dispatcher and wanted to know the fare from Trailways Bus Station to Madison Park. A few minutes later, the dispatcher called Jackson and told him the fare would be $7.50 or $8.00. Jackson stated he was en route to Madison Park. Later that night, the dispatcher attempted several times to reach Jackson by the radio but was unsuccessful.
At 2:20 a.m. on April 29, 1982, Yellow Cab No. 7 was found on I-65 in Lowndes County near the Fort Deposit exit. Blood was found on the trunk, the antenna and the sign on the top of the cab. The trip lever arm of the meter had been broken off and the microphone cord had been torn loose. The cab was out of gas. An identification card with Jackson's name and photograph were found inside the cab as well as a belt buckle. The appellant's fingerprints and palm prints were found on the cab as well as the victim's fingerprints.
On the same day around 6:00 a.m., Jackson's body was found lying face down on Dagger Hole Road in the Madison Park area. A rope was tied around Jackson's neck and the rope was tied to a limb of a bush. The body had sustained numerous lacerations and abrasions. An autopsy revealed the cause of death to be ligature strangulation.
A belt, a cap, a wallet and a meter flag were found around the area where the body was found.
Franklin Ellis testified that on the night of April 28, 1982, he, Tommy Floyd, Gregory Acres and the appellant went to the Trailways Bus Station to use the restroom. After they left the restroom, the foursome went outside and got into Yellow Cab No. 7 and directed Jackson to take them to Madison Park. Once the cab was en route, they learned the fare would be $8.00. Ellis, realizing he did not have any money, asked to return to the bus station. Jackson took Ellis back to the bus station where he got out. The other three stayed in the cab and it left again.
The next day, Floyd told Ellis that he, Acres and the appellant had killed Jackson.
On October 8, 1982, at approximately 10:00 p.m., the Montgomery Police Department received an anonymous phone call concerning the murder of Jackson. After the call, Officer R.T. Ward went to Jackson Hospital and talked with Ellis. When Ward left the hospital, he went to the Montgomery City Jail and got the appellant and took him to the robbery homicide office of the Montgomery Police Department.
At this point, the appellant was given his Miranda rights and he stated he understood them. The appellant then signed a waiver of rights form and gave a taped statement. The following morning the appellant read the typed transcript of his statement and signed it. The statement the appellant made contained basically the same facts as those to which he testified at trial.
The appellant stated that on the night of April 28, 1982, he, Acres and Floyd had been together drinking and smoking pot. At some point, they met up with Ellis and the four went to the Trailways Bus Station. Once at the bus station, Acres suggested that they "trick" the cab.
All four of them got in the cab and told Jackson to go to Madison Park. Once they heard the fare would be $8.00, Ellis was returned to the bus station and the other three remained. Once the cab arrived in Madison Park, Jackson was told to drive down Dagger Hole Road. At some point, Floyd told Jackson to stop the cab and Acres grabbed him from behind while Floyd put the car in park and pulled the radio wires out. Next, the appellant and *Page 1324 
Floyd pulled Jackson out of the cab and the three began to beat and stomp him. Acres attempted to tie up Jackson with his belt but it broke so the appellant got a rope out of the trunk of the cab. Acres put the rope around Jackson's neck and began to choke him.
At some point the appellant told the others not to kill Jackson but Acres said it was necessary to kill him so he would not be able to identify them.
Floyd then told the appellant to run over Jackson with the cab. According to the appellant, he could not get the car in gear so Floyd got in the cab and ran over Jackson. Floyd testified that the appellant ran over Jackson with the cab.
The threesome then dragged Jackson over to a bush and tied the rope around his neck and to the bush. They took some money out of Jackson's pocket and wallet and got in the cab and drove it until it ran out of gas on I-65.
The appellant presented several witnesses who testified that the appellant was a fine person and a good worker and not a violent person. Some of those witnesses stated he had gotten in with the wrong crowd and was easily led.
 I
On direct examination, the appellant testified that Floyd told him to get into the cab and run over Jackson. When he got in the cab, he could not get the cab in reverse so Floyd got in and backed over Jackson. During the cross-examination of the appellant, the following occurred.
 "Q. Now, you're saying somebody told you to run over the man?
"A. Yes, sir.
"Q. Who told you that?
"A. Tommy Floyd.
 "Q. And you got in the car to run over the man, right?
"A. Yes, sir.
"Q. You couldn't get the car in reverse?
"A. Yes, sir.
 "Q. But you could . . . If you had gotten it in reverse, you would have run over him?
 "A. It was locked. It . . . I couldn't get it down in there.
 "Q. No, sir. The question was . . . Tommy Floyd told you to run over him, and you said you did get in the car to run over him but you couldn't get it in reverse. The question to you, sir, was: If you had gotten it in reverse, you would have run over him?
"MR. CARROLL: We're going to object to that question.
"THE COURT: Overruled.
"Q. Wouldn't you, sir?
"A. Yes, sir." (R. 240-241).
The basis of defense counsel's objection was that the question propounded by the district attorney was irrelevant and immaterial. We disagree with this appellant.
It is a well-settled rule of law that a witness may be asked, during cross-examination, what his motive, reason, purpose or intent was in doing certain acts testified to by him on direct examination. Patton v. State, 197 Ala. 180, 72 So. 401 (1916); Gamble, McElroy's Alabama Evidence § 102.07 (2)(c) (3d ed. 1977).
Intent is an essential element of the offense of capital murder. To be convicted of this offense, the accused must have had a particularized intent to kill. The State's question to the appellant was obviously asked for the purpose of ascertaining if the appellant had the intent to kill Jackson. Granted, Jackson's cause of death was not due to having been run over, but if the appellant had run over him, it is very likely that Jackson could have been killed as a result of this act or at least it could have contributed to his death. The appellant's testimony as to why he got in the cab and for what purpose was extremely relevant and material to this case.
Furthermore, the appellant was not prejudiced by his answer to the question. He had already testified on direct examination that he got in the cab "to run over Jackson." *Page 1325 
We must also point out that just because the appellant testified that he would have run over Jackson had he been able to get the cab in reverse is no reason to exclude this testimony. During the trial of Wayne Eugene Ritter, he was allowed to testify that he would have also shot Edward Nasser if his partner, John Louis Evans, had not been "in the line of fire." See Evans and Ritter v. State, 361 So.2d 666 (Ala. 1978). Merely because the accused is a defendant in a capital case and makes an incriminating statement is no reason to exclude the testimony. If the appellant had stated he would not have run over Jackson if he had been able to get the car in reverse, we seriously doubt defense counsel would have good grounds of complaint to this testimony.
Therefore, we hold that the State's question and the appellant's answer were relevant and material and were properly admitted by the trial judge.
 II
The appellant contends juror Eddie Barnett was improperly excluded in violation of Witherspoon v. Illinois, 391 U.S. 510,88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Witherspoon states that a juror cannot be excluded from the venire simply because he expresses general objections to the death penalty. It must be shown that the juror is irrevocably committed against the death penalty and would vote against it "regardless of the facts and circumstances that might emerge in the course of the proceedings." Witherspoon at 88 S.Ct. 1777.
During the voir dire of the venire, the following took place:
 "THE COURT: Ladies and Gentlemen, as I mentioned to you at the beginning of the case, the charge here is a capital felony. The possible punishments on a capital felony carry the possibility of a possible death by electrocution sentence, if there is a conviction; therefore, I am required to ask you the following question: Is there any among you who would not be willing to consider all of the possible penalties as provided by State law? That is to say, is there anybody who would be irrevocably committed before the trial has begun, without any thought as to the facts that will emerge, to voting against a conviction and the imposition of the death penalt regardless of the facts and circumstances?
 "I'm going to ask you all stand together and let me repeat it one more time and then I will talk to you. I'm going to read this again so that I can make it absolutely clear.
 "Is there any among you who would not be willing to consider all of the possible penalties as provided by State law? That is to say: Is there any among you, is there anybody who would be irrevocably committed, irrevocably committed, before the trial has begun, without any thought as to the facts that will emerge, to voting against a conviction and the imposition of the penalty of death regardless of the facts and circumstances? If that is your position, would you please stand at this time." (R. 19-20).
At this point, the trial judge individually questioned each of the jurors who were standing concerning their feelings about the death penalty. Before Juror Barnett was questioned the trial judge asked six other jurors if they were irrevocably committed against the death penalty. When Barnett was asked if he was committed against the death penalty, he replied that he was.
As can be seen from the above-quoted portion of the record, the trial court clearly asked if there were any jurors who were irrevocably committed against the death penalty under any circumstances. Juror Barnett answered in the affirmative.
We do not find Juror Barnett, or any other jurors, were improperly excluded from the venire. Therefore, there is no basis for reversal on this issue.
 III
Prior to trial, defense counsel requested an evidentiary hearing to determine the voluntariness of the appellant's confession. *Page 1326 
During the trial, Officer R.T. Ward testified that, prior to the taking of the appellant's statement, the appellant was advised of his Miranda rights and he stated he understood them and wished to make a statement. Ward testified that no promises, threats, hopes of reward or other inducements were made to this appellant in order to obtain his statement. Just before the confession was to be introduced into evidence, defense counsel asked to examine Ward on voir dire. The trial judge granted this request and, after his examination, defense counsel stated he did not have any objections to the admission of the confession.
The appellant now claims, citing Jackson v. Denno,378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that the appellant was entitled to a hearing on the voluntariness of the confession outside the presence of the jury.
An accused is entitled to a hearing on the voluntariness of his confession and a proper hearing was held when defense counsel examined Ward on voir dire. However, an accused is not entitled to a hearing outside the presence of the jury unless he specifically requests that it be held outside the presence of the jury. A trial judge is not required to remove the jury for the hearing absent a request by the accused. Harris v.State, 406 So.2d 1074 (Ala.Crim.App. 1981); Gamble, McElroy'sAlabama Evidence, § 200.02 (5)(6) (3d ed. 1977). Defense counsel did not request a hearing outside the presence of thejury in his request for an evidentiary hearing or when he asked to examine Ward on voir dire.
Therefore, we hold the appellant did receive a full and fair hearing on the voluntariness of his confession and cannot now complain that such hearing was not held outside the presence of the jury.
Even had we held that it was error to not hold the hearing outside the presence of the jury, defense counsel certainly waived this error by failing to object to the admission of the statement into evidence. Moreover, the appellant was not harmed by the admission of his confession since it was substantially the same as his own testimony during trial. Jones v. State,50 Ala. App. 36, 276 So.2d 621 (1973).
After a review of the record, it is clear that the appellant's confession was voluntarily made and properly admitted into evidence. Hegman v. State, 50 Ala. App. 486,280 So.2d 192 (1973).
Therefore, we find no error occurred on this issue.
 IV
Next, the appellant argues that blacks were systematically excluded from the jury. We find no merit to this contention.
 "In Swain v. Alabama, 380 U.S. 202, [85 S.Ct. 824, 13 L.Ed.2d 759] (1965), the Supreme Court recognized that a defendant's constitutional rights might be violated if there existed a pattern of deliberate and continued exclusion of blacks from juries by the State. However, the court also observed that a defendant bears a heavy burden in attempting to demonstrate systematic discrimination of constitutionally significant magnitude."
Dewhart v. State, 455 So.2d 167 (Ala.Crim.App. 1984); Brooksv. State, 471 So.2d 507 (Ala.Crim.App. 1984).
There is no requirement that a prosecutor be examined about his reasons for the use of his challenges in a case. Swain v.Alabama, supra; Walker v. State, 428 So.2d 139 (Ala.Crim.App. 1982); Smith v. State, [Ms. 6 Div. 415, July 24, 1984] (Ala.Crim.App. 1984).
However, in the case at bar, the prosecutor was questioned on this matter and the pertinent portion of the record is quoted below:
"THE COURT: What did you use to strike the jury?
 "THE WITNESS: Your Honor, I took materials that . . . Well, first of all, the strike list is furnished by the court and certain other information gathered by our office. I struck those that I thought *Page 1327 
would acquit and did not strike those that I thought would tend to convict. That is the basis on which I struck this jury.
"THE COURT: Did you base it totally on color?
"THE WITNESS: No, sir." (R. 60).
Since the prosecutor told the trial court that he did not use his strikes to exclude blacks from the jury and the appellant did not present any evidence of the systematic exclusion of blacks from the jury, it is clear that the appellant failed to meet the required burden of proof on this issue. Therefore, we find no error occurred in this instance.
 V
Section 13A-5-53 (a), Code of Alabama 1975 provides:
 "In any case in which the death penalty is imposed, in addition to reviewing the case for any error involving the conviction, the Alabama court of criminal appeals, subject to review by the Alabama supreme court, shall also review the propriety of the death sentence. This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in this case."
First of all, there is no error contained in the record which would adversely affect the rights of the appellant.
Secondly, the trial judge's findings concerning the aggravating and mitigating circumstances in this case are fully supported by the evidence presented at trial.
Thirdly, to determine if death was the proper sentence in this particular case, this court must decide:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellant level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Ala. Code, § 13A-5-53 (b) (1975).
This court cannot find anything in this record which indicates that this sentence was imposed under the influence of passion, prejudice or in any arbitrary manner.
After an independent examination of the aggravating and mitigating circumstances in this case, we find that the four statutory aggravating circumstances of this case clearly outweigh the mitigating circumstances.
Finally, the appellant's sentence of death is not excessive or disproportionate in relation to the sentence imposed upon other defendants in similar cases. See Womack v. State,435 So.2d 754 (Ala.Crim.App), affirmed, 435 So.2d 766 (Ala. 1983);Ritter v. State, supra; Luke v. State, 444 So.2d 393
(Ala.Crim.App), affirmed, 444 So.2d 400 (Ala. 1983); Baldwin v.State, 456 So.2d 117 (Ala.Crim.App. 1983).
After a thorough examination of this record, we find it free of error. This appellant's conviction and sentence of death is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.
 APPENDIX A IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA STATE OF ALABAMA, PLAINTIFF, VS. SAMUEL FELDER, DEFENDANT. CRIMINAL CASE NO. 82-1892-TH SENTENCING ORDER
Samuel Felder stands convicted by a jury of his peers of the capital offense of the *Page 1328 
murder of Elbert Lee Jackson in violation of Alabama Code Section 13A-5-47 (b).
In a separate sentencing phase, the same jury returned its advisory verdict that the defendant be sentenced to death.
The Court in accord with the statutory directives set forth in Section 13A-5-47 (d), Code of Alabama, has ordered and received a written pre-sentence report which has been made part of the record in this case. No part of this pre-sentence report has been, or shall be, kept confidential.
The State and Defendant have been given the right to present evidence to the Court about any part of the report. The Court has considered the Pre-sentence report as to the background of the Defendant and as to other information in the report which is prescribed by law or Court rule for felony cases generally. The Court, however, has made its own independent analysis of the existence or nonexistence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and carefully reviewed to the enumerated aggravating circumstances (Section 13A-5-49, Code of Alabama) and to mitigating circumstances whether enumerated in the Code or not (Section 13A-5-51 and Section13A-5-52, Code of Alabama).
The parties have been given full and ample opportunity to present arguments concerning the existence of aggravating and mitigating circumstances.
The Court now, in accord with the Alabama Code Section13A-5-47 (d), proceeds to enter written findings of fact summarizing the crime and the Defendant's participation in it. The Court also proceeds to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and as to any additional mitigating circumstances offered pursuant to Section13A-5-52.
 SUMMARY OF CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
On April 28, 1983, defendants Samuel Felder, Thomas Floyd, Jr. and Gregory Acres and another man named Frank Ellis discussed committing a robbery. Defendants Felder, Floyd and Acres entered Yellow Taxicab No. 7 driven by Elbert Lee Jackson while it was at the Trailways Bus Station. Frank Ellis decided not to go through with the plan and made an excuse to leave. The three defendants instructed Jackson to carry them to Madison Park. Upon arrival at Madison Park, Gregory Acres grabbed the victim from behind, Floyd hit him in the face, put the cab in park and took the keys. Acres held the victim until Floyd and Felder came around the car and dragged the victim out of the cab. After all three had struck the victim several times, Acres then got the victim's money out of his pocket and gave it to Floyd. Felder, Floyd and Acres then all proceeded to beat the victim with their hands, fists and feet until a blow struck by Felder knocked him to the ground. At this point, all three began to kick and stomp the victim. At no time did the victim resist and continually begged them to stop. At one point while Felder was stomping the victim in the face, Acres was kicking him and Floyd was jumping up and down on his chest. Acres then said that "we might as well go ahead and kill him because we are probably going to jail anyway". Felder then made a statement that maybe they should stop, but Acres said, "No, he can identify us and especially you because you are the biggest one of us." Acres then instructed Felder to go to the trunk of the car and see if he could find a rope. While there is some conflict in the testimony as to the exact order of events, the evidence was clear that Felder removed a rope from the car and one of the men placed the rope around the neck of the victim, who at that time was bleeding and coughing up blood. There was evidence that Acres tightened the rope around the victim's neck and that at one time one man was on one end of the rope and two men were on the other end of the rope that was around the victim's neck *Page 1329 
and the rope was pulled tight. At this point they still did not think he was dead, so Floyd instructed Felder to get into the cab and back it over the victim. Felder's testimony was that he got into the car and tried to back it over the victim, but that he could not get it in gear and Floyd got into the car and backed it over the victim. Floyd's testimony was that Felder did get the car in gear and backed it over the victim. They still were not sure the victim was dead so they then grabbed both ends of the rope that was still around the victim's neck and he was left hanging. Testimony indicated that the three believed the victim to still be alive at the time he was tied to the tree. Felder, Floyd and Acres then took the cab and drove it down Interstate 65 until it ran out of gas somewhere north of Ft. Deposit. The next morning the victim's body was found tied to the tree in Madison Park, Montgomery, Alabama.
After a six months investigation, Montgomery police talked with Frank Ellis, who had been beaten by Gregory Acres and was in the emergency room at Baptist Hospital. Ellis stated that Acres had beaten him because Acres was afraid Ellis was going to report what had happened to the police. Felder, Floyd and Acres were arrested shortly thereafter and charged with capital murder.
SPECIFIC FINDINGS CONCERNING THE EXISTENCE OR NONEXISTENCE OF EACH AGGRAVATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-49; EACH MITIGATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-51; AND ANY ADDITIONAL MITIGATING CIRCUMSTANCES OFFERED PURSUANT TO SECTION 13A-5-52.
 ENUMERATED AGGRAVATING CIRCUMSTANCES
The capital offense was committed by a person under sentence of imprisonment.
The Defendant has not been previously convicted of another capital offense nor of a felony involving the use of a threat of violence to the person.
This offense is not considered by the Court to involve the aggrevating circumstance of "knowingly creating a great risk of death to many persons".
The offense was committed while the defendant was engaged in or was an accomplice in the commission of a robbery.
The evidence does not indicate the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
Under the evidence presented, the Court does not find or consider that the capital offense was committed for pecuniary gain.
The Court does not find or consider under the evidence presented that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
The Court does find from the evidence presented at trial that the capital offense was especially heinous, atrocious and cruel compared to other capital offenses. This finding is based upon the evidence that the victim was repeatedly kicked, stomped, beaten, tied to a tree with the rope around his neck, and run over by his own taxi cab. The evidence indicates that at no time did the victim ever resist or fight back. The conclusion of the Court as to the heinous, atrocious or cruel nature of the offense is made after a careful review of all the evidence and after considering the totality of the circumstances of this case.
 MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
The evidence does indicate that the Defendant has a significant history of prior criminal activity, including a burglary conviction and an auto burglary conviction.
The preponderance of the evidence does not show that Defendant was under the influence of extreme mental or emotional disturbance at the time of the capital offense. *Page 1330 
The preponderance of the evidence establishes that the victim, Elbert Lee Jackson, was not a participant in the Defendant's conduct, and the preponderance of the evidence further establishes that the victim did not consent to the Defendant's conduct.
The evidence establishes that the Defendant was a major participant in the capital offense.
The preponderance of the evidence establishes that the Defendant was not under extreme duress at the time of the capital offense.
The preponderance of the evidence further establishes that the Defendant was not under the substantial domination of another person.
The Court determines from a preponderance of the evidence presented that Samuel Felder did have the capacity to appreciate the criminality of his conduct and finds no indication that this capacity was impaired.
The evidence indicates that the Defendant was twenty-four years of age at the time of the capital offense.
In addition to the above enumerated mitigating circumstances, the Defendant was given an opportunity to present any other evidence of mitigating circumstances. The Defendant, through Counsel, asked the Court to consider that Samuel Felder suggested to the co-defendants that they should stop and that they should carry the victim to a hospital.
 CONCLUSION
All of the proper evidence being received and arguments given, the Court has weighed each individual aggravating circumstance as it applies to Samuel Felder and has weighed such aggravating circumstances collectively. The Court has weighed each mitigating circumstance individually, and has weighed the mitigating circumstances collectively.
It is the conclusion of this Court that the aggravating circumstances overwhelmingly outweigh the mitigating circumstances. Accordingly, the Court accepts the recommendation of the jury that the penalty of death be imposed upon Samuel Felder.
Formal sentencing be and is hereby set for June 2, 1983, at 9:00 a.m.
DONE this the 1st day of June, 1983.
 /s/ Randall Thomas
H. RANDALL THOMAS Circuit Judge