486 So.2d 1309 (1984)
Tommy FLOYD
v.
STATE.
3 Div. 844.
Court of Criminal Appeals of Alabama.
March 20, 1984.
On Return to Remand May 14, 1985.
Rehearing Denied June 11, 1985.
*1311 W. Mark Anderson, III, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen. and Rivard Melson and William D. Little, Asst. Attys. Gen., for appellee.
HUBERT TAYLOR, Judge.
The appellant, Tommy Floyd, was indicted and convicted for the capital offense of murder of Elbert Lee Jackson, during a robbery in the first degree, or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. His punishment was fixed at death by electrocution. Because this is a conviction of a capital offense resulting in a sentence of death, we are compelled to include a detailed narration of the facts presented at trial.
At approximately 5:30 p.m. on April 28, 1982, Franklin Ellis encountered Tommy Floyd, Samuel Felder, and "Tank" Acres on High Street in Montgomery. Since all of them were going to the Riverside area, they walked together. After arriving thirty-five to forty minutes later, Ellis went to his uncle's home and the other three men went to Floyd's sister's home. About fifteen minutes later, the four again set out together. Floyd, Felder, and Acres were conversing while they were walking, but Ellis did not hear the content of their conversation because he was walking ahead of them. As they passed cars parked along the curbs, the three checked the doors of the parked cars.
When the group reached Madison Avenue, Ellis went to the Trailways Bus station where he went into the bathroom. Floyd, Felder, and Acres followed. While Ellis was using the bathroom, he heard the other three mumbling. They left the bathroom a couple of minutes before Ellis. When Ellis exited the bus station, he saw Floyd, Felder, and Acres in the back seat of Yellow Cab number seven, which was parked to the left of the front door of the bus station. According to the dispatcher's notation in his log, the driver of cab number seven picked up a fare at the Trailways Bus station at 10:19 p.m. and asked the dispatcher for the estimated price to Madison Park, 231 North. Ellis got in the cab at the trio's request and asked where they were going. He got no answer, but he did hear over the radio, "That will be eight dollars." At this point, Ellis told the cab driver that he had forgotten something, so the driver made a U-turn and returned to the bus station. Ellis had decided that he did not want to go because he had no money for the fare and he did not want to depend on any of the other three to pay. At the bus station, he returned to the bathroom, waited ten minutes, and then left the station through the back door.
At approximately 2:20 a.m. on April 29, a 1974 Plymouth Fury belonging to the Yellow Cab Company and bearing the number "7" was found abandoned on Interstate 65, South, north of the Hope Hull exit. An examination of the cab revealed damage to the sign on top of the cab and to the undersides of the front and rear bumpers. Fresh mud was splattered on the exterior of the cab and was also found in the interior, being especially concentrated in the left back seat area and the driver's floorboard. *1312 Blood stains were present on the lid of the trunk, on the rear antenna, on the sign located on top of the cab, and on the left side of the back seat. Missing from the cab was the arm from the fare meter and the two-way radio microphone and its cord. A belt buckle was found on the left rear floorboard. The fare meter read $8.10.
Elbert Lee Jackson had been assigned to cab number seven. The dispatcher's log showed that Jackson had two recorded fares between 5:00 p.m. and 10:19 p.m. when Jackson picked up the fare at the bus station. The estimated charges for these two fares totalled $5.30. By normal business procedure, this money and the cash kept to make change was to be turned in to the company at the end of Jackson's shift.
The dispatcher attempted to reach Jackson by radio at approximately midnight. He received no answer. His last communication with Jackson was at 10:25 p.m. when Jackson told him he was en route to Madison Park.
Jackson's body was discovered at approximately 6:30 a.m. on April 29. It was found in the Madison Park area about a mile down a dirt road which turns off Highway 231 North. The body was lying facedown between a ditch and some bushes. A rope was tied to one of the branches. The other end of the rope was tied around Jackson's neck. Surrounding physical evidence blood stains on the road gravel and impressions in the mudindicated that the body had been dragged about thirteen feet and that death occurred along the edge of the road in the area of the ditch. An impression was left in the mud of the drainage ditch "where something soft had been pressed down into the ground and slid." Physical evidence collected at the scene included a taxi driver's cap, a belt without a buckle, a broken arm from a taxi meter, and a wrist watch which had stopped at 10:32. The pockets of Jackson's pants had been pulled out.
The autopsy revealed that, in the pathologist's opinion, Jackson's death was due to ligature strangulation by the rope around his neck; however, the pathologist could not rule out, as the cause of death, a very heavy object having been placed on Jackson's chest for a number of minutes. Other injuries noted were facial abrasions and lacerations; black eyes consistent with blows by a fist; stretching abrasions to the abdomen consistent with the decedent having been run over by an automobile; bruises and contusions on the arms and back; sliding abrasions to the chest, arms, hands, and lower back; and injuries to the body consistent with kicks or stomps. The pathologist opined that all injuries were inflicted either before or around the time of death, which he estimated to be at approximately 1:00 a.m. or after.
After the murder, Floyd made several statements to Ellis. In a conversation occurring the day after the murder, Floyd told Ellis that after Felder knocked the cab driver down, Floyd put his foot on him and "did like that." Two weeks later, Floyd told Ellis that he "don't care how long it take me to get out or what they do ... I'm gonna get you." This threat was evoked by Ellis's sister's accusation to Floyd that he had killed a cab driver.
Approximately six months later, Floyd was arrested for the capital murder of Jackson. After several Miranda warnings and a written waiver of those rights, Floyd gave a voluntary statement. He claimed to have given the statement because "I was around here hurting, you know, so I wanted to tell somebody about it." In substance, Floyd's confession was as follows:
After Floyd, Felder, Acres, and Ellis arrived at the bus station and saw the cab, they said, "Let's get the cab." They entered the restroom. After exiting the restroom, Ellis returned on the pretext of forgetting something. Acres told Floyd and Felder, "Let's go, let's leave him," so they got in the cab. Floyd sat in the front seat and Felder and Acres rode in the back.
The cab driver then drove toward Madison Park at Felder's direction. The trio had no predetermined plan to rob the cab driver, but while riding to Madison Park, they began "making little signs and punching one another." When they arrived at *1313 the requested destination, "things jumped off."
After the driver stopped the cab, Acres grabbed him from behind and Floyd put the car in park. Then, they all got out. Felder grabbed the driver and Acres went through his pockets. After the three men slapped him, Felder knocked him onto the ground and the three continued their attack by kicking him. Floyd kicked him in the side and chest and also jumped on his chest. Then the three men tied a rope around the victim's neck, dragged him by the rope to a small tree, tied the other end of the rope to the tree, all the while choking him.
During this assault, which lasted less than five minutes, the victim pleaded, "Don't hurt me, you all can have the money, don't hurt me." Yet Acres said, "We gonna rob him, we might as well go ahead and kill him.... If we don't, we going off anyway." They wanted to leave no witness.
So while the victim was tied to the tree, Felder got in the cab and ran over him, but when they left the driver, he was still breathing and coughing. Before they drove away in the cab, Floyd pulled the microphone from the radio and threw it into some bushes close to where the victim lay. Then they drove down Interstate 65 until the car ran out of gas. Before they abandoned the car, Felder tried to pull the taxi sign off the top of the cab. After no success, Felder and his two companions hitchhiked back to Montgomery. Floyd arrived home at daybreak.
The driver had twenty to thirty dollars in his pockets and under the taxi's seat. Acres took the money from both locations. The seven to eight dollars that Floyd received was spent on wine.

I
The indictment contains eight counts, each charging Floyd with the murder of Elbert Lee Jackson during a robbery as prescribed by § 13A-5-40(a)(2), Code of Alabama 1975. In the first four counts, the property alleged to have been feloniously taken is a taxi; in the remaining four counts, the property alleged to have been feloniously taken is an unknown amount of currency. Floyd argues that the trial court erroneously denied his motion to require the State to elect under which count the question of Floyd's guilt or innocence would be submitted to the jury. We find this contention to be without merit.
The general rule is that the trial court will not exercise its power to compel an election unless it appears either from the indictment or the evidence that an attempt is being made to convict the defendant of two or more offenses growing out of separate and distinct transactions. Williams v. State, 383 So.2d 547 (Ala.Cr.App.1979), aff'd, 383 So.2d 564 (1980), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Here, the purpose of the eight counts was not to charge two or more separate offenses, but to vary the description of one and the same offense based upon one and the same transaction.[1] Jackson's death during a robbery gives rise to only one capital murder conviction. Since the purpose and effect of the joinder of these eight counts was to meet every probable contingency of evidence, Jackson v. State, 74 Ala. 26 (1883), rather than to convict Floyd of two or more distinct offenses, the rule requiring election was inapplicable. See e.g., Nevill v. State, 133 Ala. 99, 32 So. 596 (1902) (where the State was not required to elect among three counts, each charging robbery of the same person, but of a different piece of property).

II
After the jury rendered its verdict of guilty, Floyd, with the consent of the State and with the approval of the trial court, waived the participation of a jury in *1314 the sentencing phase of the trial pursuant to § 13A-5-44(c), Code of Alabama 1975. We have reviewed that portion of the record pertaining to Floyd's waiver of jury participation and we find that Floyd was explicitly informed of his right to have the jury involved in the sentencing proceeding and that Floyd freely and intelligently waived that right.
Thereafter, the trial court ordered a pre-sentence investigation report as specified in § 13A-5-47(b) and, with the consent of both parties, postponed the sentencing hearing as allowed by § 13A-5-45(a). Floyd's sentence of death was pronounced approximately five months later. However, the record on appeal includes no transcript of a sentencing hearing. The only support for the assumption that a hearing was held is the trial court's references in its sentencing order. For example, the order states that the court gave the parties the right to present evidence in response to the pre-sentence report and to present arguments concerning the presence of, or lack of, aggravating and mitigating circumstances. In addition, the order notes that the court heard facts pertaining to the aggravating and mitigating circumstances.
Although we are inclined to think that some explanation exists for the absence of a transcript reflecting a sentencing hearing, we find none in the record proper, in the transcript, or in the briefs submitted to this court. Thus, we conceive only two obvious possibilities: (1) no hearing was conducted, or (2) a hearing was held, but the transcript is nonexistent. In either instance, we remand for a new sentencing hearing.
Assuming that no sentencing hearing was held, we must remand because the comprehensive procedure mandated by Alabama's death penalty statute was not followed before Floyd's death sentence was imposed. Section 13A-5-47 provides that, after the right to the jury's advisory verdict is waived, the trial court's sentencing function begins; however, the trial court must first hold a sentencing hearing in accordance with § 13A-5-45 wherein both parties are allowed to present evidence and arguments. The sentencing hearing is one of the most critical stages under Alabama's death penalty law; "[i]t is a due process hearing of the highest magnitude." Mack v. State, 375 So.2d 476, 501 (Ala.Cr.App.), aff'd, 375 So.2d 504 (Ala.1979). In this case, the noncompliance with our statute's standards for guiding the discretion of the sentencing authority does not avoid possible arbitrary and capricious infliction of the death penalty.
Assuming that a hearing was held but the transcript is nonexistent, we must remand for a new sentencing hearing even though the trial court entered specific written findings regarding the existence or nonexistence of each aggravating circumstance listed in § 13A-5-49 and or each mitigating circumstance enumerated in § 13A-5-51 or referred to in § 13A-5-32. The mere recitation of these findings is not sufficient. The Supreme Court of the United States has mandated that "the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." Gardner v. Florida, 430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (Stevens, J., joined by Stewart and Powell, JJ.). Alabama's death penalty statute requires, as a constitutionally mandated procedure, that we review the propriety of the imposition of the death penalty. Ala.Code § 13A-5-53 (1975). This review must include the determinations of whether any error adversely affecting the defendant's rights occurred in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence. Because the transcript before us does not contain the proceedings of the sentencing hearing, we are precluded from engaging in our mandated review. When, as in the case before us, the record is so deficient that it is impossible for us to perform our required review or it creates a substantial risk that the penalty is being imposed in an arbitrary and capricious *1315 manner, the defendant's sentence cannot stand. See Stephens v. Zant, 631 F.2d 397, 403 (5th Cir.1980), modified on other grounds, 648 F.2d 446 (5th Cir.1981), rev'd on other grounds, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
In conclusion, we hold that Floyd's conviction and his valid waiver of jury participation are not tainted; however, we set aside the sentence of death and remand this case for the trial court to hold a sentencing hearing in accordance with §§ 13A-5-45 and -47 and to impose the appropriate penalty after the new proceedings.
In compliance with § 13A-5-47(b) and in keeping with the rule of Gardner v. Florida, supra, no part of Floyd's presentence investigation report is to be kept confidential and the report is to be made a part of the record in this case. In compliance with § 13A-5-47(d), the trial court is required to enter written findings concerning the aggravating and mitigating circumstances and also to enter written findings of fact summarizing the crime and Floyd's participation in it. The court is to consider only those facts supported by the record before it. We have been unable to substantiate all the factual findings of the summary of the crime and Floyd's participation enumerated in the sentencing order presently before us. Finally, we address Floyd's contention that the trial court erred in finding as an aggravating circumstance that the offense was committed while he was engaged in the commission of a robbery because this aggravating circumstance was charged in the indictment. This finding is specifically allowed by § 13A-5-50.
With these directives, this cause is remanded.
REMANDED WITH INSTRUCTIONS.
All the Judges concur.

On Return to Remand
PATTERSON, Judge.
This case was remanded to the Circuit Court of Montgomery County, Alabama, on March 20, 1984, with instructions to hold a sentencing hearing in accordance with §§ 13A-5-45 and -47, Code 1975, and to impose the appropriate sentence after the new sentencing proceedings. This action became necessary due to the fact that the record on appeal did not include a transcript of a sentencing hearing, and without a record of such proceedings before us, we were precluded from reviewing the propriety of the imposition of the death penalty as mandated.
The Circuit Court of Montgomery County, Alabama, did conduct a sentencing hearing in strict conformity with our directive, and has made due return to this court. The circuit court has filed with this court on return to remand, a record containing the complete sentencing proceedings. The sentencing hearing was held on November 2, 1984, and the transcript thereof was filed with this court on January 9, 1985. This record also contains a sentencing order of the circuit judge dated November 30, 1984. It appears from the comments of the trial judge in the sentencing order that a sentencing hearing had been previously held on June 2, 1983, but a transcript of same, as we have noted, was not included in the original record on appeal. Nevertheless, pursuant to our order, the trial judge conducted a completely new sentencing hearing on November 2, 1984. On November 30, 1984, the circuit judge sentenced the appellant to death. The record reflects that the appellant and his counsel were present in court throughout all of the sentencing proceedings.
Subsequent to the filing of the record on return to remand of January 9, 1985, it was discovered that a typographical mistake had been made in the circuit judge's sentencing order. The sentencing order, entered on November 30, 1984, incorrectly stated that the trial court had found as an aggravating circumstance that the capital offense was committed by a person under sentence of imprisonment. The trial court actually found that the capital offense was not committed by a person under sentence of imprisonment. On motion of the State *1316 and pursuant to the authority of Rule 10(f), A.R.A.P., the trial judge corrected the sentencing order and substituted the corrected order for the order previously filed. A copy of this corrected sentencing order is attached hereto, made a part hereof, and marked Exhibit "A". The corrected sentencing order, along with the order of correction, was filed with this court in a supplemental record on March 21, 1985. The corrected sentencing order reflects the correct finding, and also reflects the fact that because the above mentioned circumstance was not found to exist, the trial court did not consider it in sentencing.
Having, in our previous opinion of March 20, 1984, held that Floyd's conviction and his waiver of jury participation in the sentencing phase were proper, we now review the sentencing proceedings of the trial and the propriety of the imposition of the death penalty.
The scope of our review in death cases is set out in A.R.A.P. 45A as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take the appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have followed this standard in the instant case and have found no "plain error or defect in the proceedings" either in the guilt phase or in the sentencing phase of the trial.
In addition, Beck v. State, 396 So.2d 645 (Ala.1980), requires a three-tiered analysis in death cases:
(1) Whether the crime was punishable by death;
(2) Whether similar crimes are being punished capitally throughout the State; and
(3) Whether the death sentence is appropriate in relation to the defendant.
In reviewing the instant case in the light of the requirements of Beck, we make the following findings: First, Floyd was convicted of murder during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama (1975). The offense is by statutory definition a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout Alabama. See, e.g., Thomas v. State, 460 So.2d 207 (Ala.Crim. App.1983), aff'd, 460 So.2d 216 (Ala.1984); Waldrop v. State, 459 So.2d 953 (Ala.Crim. App.1983), aff'd, 459 So.2d 959 (Ala.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Weeks v. State, 456 So.2d 395 (Ala.Crim.App.1983), aff'd, 456 So.2d 404 (Ala.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Luke v. State, 444 So.2d 393 (Ala.Crim. App.), aff'd, 444 So.2d 400 (Ala.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); Coulter v. State, 438 So.2d 336 (Ala.Crim.App.1982), aff'd, 438 So.2d 352 (Ala.1983); Womack v. State, 435 So.2d 754 (Ala.Crim.App.), aff'd, 435 So.2d 766 (Ala.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983); Bush v. State, 431 So.2d 555 (Ala.Crim. App.1982), aff'd, 431 So.2d 563 (Ala.1983). See also Beck v. State, 396 So.2d 645, n. 5 (Ala.1981) (opinion after remand, as modified on denial of rehearing);[1] Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 225 (1982). Two-thirds of the death sentences imposed in Alabama are in cases of robbery-murder. Thomas v. State, 460 So.2d at 225. In regard to the third determination, Beck requires us to examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any. Whether the death sentence is appropriate for a particular defendant in light of the penalties imposed on his accomplices was thoroughly examined in Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App.1983), reversed on other *1317 grounds, 461 So.2d 852 (Ala.1984), wherein we stated:
"While Beck, 396 So.2d at 664, obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in the crime receive the same punishment. `There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence.... Each case is evaluated on its unique factual circumstances.'"
(Citations omitted.)
In the case sub judice, the appellant's two accomplices have each been tried and sentenced to death for their part in the commission of the crime.[2] And, third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in relation to this defendant.
The trial court conducted a sentencing hearing pursuant to the requirements of Alabama Code (1975), § 13A-5-45 and § 13A-5-47, as directed by this Court. After the sentencing hearing the trial court proceeded to determine the sentence. Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report ordered pursuant to § 13A-5-47(b) and included in the record, the trial court entered specific written findings in compliance with § 13A-5-47(d) in its written order.
In its findings of fact (See Exhibit "A" attached), the trial court found, as aggravating circumstances, that the defendant had been previously convicted of a felony involving the use or threat of violence to the person (two robbery convictions); that the offense was committed while the defendant was engaged in or was an accomplice in the commission of a robbery; and that the capital offense was especially heinous, atrocious, and cruel compared to other capital offenses. The trial court further found that none of the enumerated mitigating circumstances set out in § 13A-5-51 were present. The trial court did find, as a mitigating circumstance, that defendant cooperated with the State in the prosecution of his co-defendants, Felder and Acres. Thus, the trial court found the existence of three aggravating circumstances and one mitigating circumstance. The trial court examined the aggravating and mitigating circumstances as required and found that the aggravating circumstances set out by law outweighed the mitigating circumstances and sentenced Floyd to death.
After a careful review of the record we find no errors during the sentencing phase proceedings which adversely affected the appellant's rights. The appellant in his brief does not point to any errors, and in fact concedes that the correct procedure was followed.
These findings and conclusions of the trial court concerning the aggravating and mitigating circumstances were fully supported by the evidence in this case and we so find. We also find that the aggravating circumstances far outweigh the mitigating circumstance. We concur in the findings of the trial court that death is the appropriate sentence in this case. The defendant was a major participant in the commission of the crime. The victim, Elbert Lee Jackson, was repeatedly kicked, stomped, and beaten, tied to a tree with a rope around his neck, and run over by his own taxicab. The appellant, along with his co-defendants, deliberately executed the victim so that he could not identify them as his robbers. They carried out the execution in a torturous, agonizing, cruel, and inhuman way. The victim offered no resistance. He offered his attackers his money and *1318 asked them not to hurt him, but to no avail. It is true that appellant cooperated with the State to the extent of testifying against his co-defendants, but his cooperation was not the result of an agreement with the State for a recommendation of leniency. His cooperation came after his conviction, and it is reasonable to interpret it as a unilateral attempt to save himself from the death penalty.
In reviewing this sentence, we are also bound by the provisions of § 13-5-53, Code of Alabama 1975. Our findings above comply with § 13A-5-53(a). In compliance with § 13A-5-53(b) we find that: (1) there is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is the proper sentence in this case; and (3) considering the crime committed and the defendant, the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the complete record in both the guilt and sentence phases of Floyd's trial, and we have found no error. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.

EXHIBIT A

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA, Plaintiff,

vs.

TOMMY FLOYD, Defendant.

CRIMINAL CASE NO. 82-1806-TH

CORRECTED SENTENCING ORDER
Tommy Floyd was tried in this Court for capital murder and was found guilty by a jury on January 5, 1983. Floyd, after being explicitly informed of his right to have the jury involved in the sentencing proceeding, and with consent of all parties, waived the participation of a jury in the sentencing phase of the trial pursuant to Sec. 13A-5-44(c) and Sec. 13A-5-46(a), Code of Alabama 1975.
The Court then ordered a presentence investigation report as specified in Sec. 13A-5-47(b), Code of Alabama 1975, and, with consent of all parties, the Court postponed the sentencing hearing as allowed by Sec. 13A-5-45(a), until it received the presentence investigation report specified in Sec. 13A-5-47(b), Code of Alabama 1975. No part of this presentence report has been, or shall be, kept confidential and the report has been made a part of the record in this case.
The sentencing hearing was originally held on June 2, 1983, in accordance with Sec. 13A-5-45 and Sec. 13A-5-47, Code of Alabama 1975. However, the record on appeal did not include a transcript of a sentencing hearing, therefore, the Court of Criminal Appeals remanded the above action for this Court to hold a new sentencing hearing in accordance with Sec. 13A-5-45 and Sec. 13A-5-47, Code of Alabama 1975, and to impose the appropriate penalty.
Therefore, the State and Defendant have again been given the right to present evidence to the Court about any part of the presentence report. The Court has considered the presentence report as to the background of the Defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The Court, however, has made its own independent analysis of the existence or nonexistence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and carefully reviewed to the enumerated aggravating circumstances (Sec. 13A-5-49, Code of Alabama 1975) and to mitigating circumstances whether enumerated in the Code or not (Sec. 13A-5-51 and Sec. 13A-5-52, Code of Alabama 1975) and the parties have been given full and ample opportunity *1319 to present arguments concerning the existence of aggravating and mitigating circumstances.
The Court now, in accord with the Alabama Code Sec. 13A-5-47(d), proceeds to enter written findings of fact summarizing the crime and the Defendant's participation in it. The Court also proceeds to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Sec. 13A-5-49, each mitigating circumstance enumerated in Sec. 13A-5-51, and to any additional mitigating circumstances offered pursuant to Section 13A-5-52.

SUMMARY OF CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
At approximately 5:30 p.m. on April 28, 1982, Franklin Ellis encountered Tommy Floyd, Samuel Felder, and "Tank" Acres on High Street in Montgomery. Since all of them were going to the Riverside area, they walked together. After arriving thirty-five to forty minutes later, Ellis went to his uncle's home and the other three men went to Floyd's sister's home. About fifteen minutes later, the four again set out together. Floyd, Felder, and Acres were conversing while they were walking, but Ellis did not hear the content of their conversation because he was walking ahead of them. As they passed cars parked along the curbs, the three checked the doors of the parked doors.
When the group reached Madison Avenue, Ellis went to the Trailways Bus Station where he went into the bathroom. Floyd, Felder, and Acres followed. While Ellis was using the bathroom, he heard the other three mumbling. They left the bathroom a couple of minutes before Ellis. When Ellis exited the bus station, he saw Floyd, Felder, and Acres in the back seat of Yellow Cab number seven, which was parked to the left of the front door of the bus station. According to the dispatcher's notation in his log, the driver of cab number seven picked up a fare at the Trailways Bus Station at 10:19 p.m. and asked the dispatcher for the estimated price to Madison Park, 231 North. Ellis got in the cab at the trio's request and asked where they were going. He got no answer, but he did hear over the radio, "That will be eight dollars." At this point, Ellis told the cab driver that he had forgotten something, so the driver made a U-turn and returned to the bus station. Ellis had decided that he did not want to go because he had no money for the fare and he did not want to depend on any of the other three to pay. At the bus station, he returned to the bathroom, waited ten minutes, and then left the station through the back door.
Elbert Lee Jackson had been assigned to cab number seven. The dispatcher attempted to reach Jackson by radio at approximately midnight. He received no answer. His last communication with Jackson was at 10:25 p.m. when Jackson told him he was enroute to Madison Park.
According to Floyd's confession, after Floyd, Felder, Acres, and Ellis arrived at the bus station and saw the cab, they said, "Let's get the cab." They entered the restroom. After exiting the restroom, Ellis returned on the pretext of forgetting something. Acres told Floyd and Felder, "Let's go, let's leave him." So they got in the cab. Floyd sat in the front seat and Felder and Acres rode in the back.
The cab driver then drove toward Madison Park at Felder's direction. The trio had no predetermined plan to rob the cab driver, but while riding to Madison Park, they began "making little signs and punching one another." When they arrived at the requested destination, "things jumped off."
After the driver stopped the cab, Acres grabbed him from behind and Floyd put the car in park. Then they all got out. Felder grabbed the driver and Acres went through his pockets. After the three men slapped him, Felder knocked him onto the ground and the three continued their attack by kicking him. Floyd kicked him in the side and chest and also jumped on his chest. Then the three men tied a rope around the victim's neck, dragged him by the rope to a *1320 small tree, tied the other end of the rope to the tree, all the while choking him.
During this assault, which lasted less than five minutes, the victim pleaded, "Don't hurt me, you all can have the money, don't hurt me." Yet Acres said. "We gonna rob him, we might as well go ahead and kill him ... If we don't, we going off anyway." They wanted to leave no witnesses.
So while the victim was tied to the tree, Felder got in the cab and ran over him, but when they left the driver, he was still breathing and coughing. Before they drove away in the cab, Floyd pulled the microphone from the radio and threw it into some bushes close to where the victim lay. Then they drove down Interstate 65 until the car ran out of gas. Before they abandoned the car, Felder tried to pull the taxi sign off the top of the cab. After no success, Felder and his two companions hitchhiked back to Montgomery. Floyd arrived home at daybreak.
The driver had twenty to thirty dollars in his pockets and under the taxi's seat. Acres took the money from both locations. The seven to eight dollars that Floyd received was spent on wine.
Jackson's body was discovered at approximately 6:30 a.m. on April 29 in the Madison Park area. The victim's wristwatch had stopped at 10:32 and the autopsy revealed that the cause of death was due to ligature strangulation by the rope around his neck; however, the pathologist could not rule out, as the cause of death, a very heavy object having been placed on Jackson's chest for a number of minutes.
Approximately six months later, Floyd was arrested for the capital murder of Jackson.
SPECIFIC FINDINGS CONCERNING THE EXISTENCE OR NONEXISTENCE OF EACH AGGRAVATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-49; EACH MITIGATING CIRCUMSTANCE ENUMERATED IN SECTION 13A-5-51; AND ANY ADDITIONAL MITIGATING CIRCUMSTANCES OFFERED PURSUANT TO SECTION 13A-5-52.

ENUMERATED AGGRAVATING CIRCUMSTANCES
The capital offense was not committed by a person under sentence of imprisonment.
The Defendant has been previously convicted of a felony involving the use or threat of violence to the person.
This offense is not considered by the Court to involve the aggravating circumstance of "knowingly creating a great risk of death to many persons."
The offense was committed while the defendant was engaged in or was an accomplice in the commission of a robbery.
The evidence does not indicate the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
Under the evidence presented, the Court does not find or consider that the capital offense was committed for pecuniary gain.
The Court does not find or consider under the evidence presented that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
The Court does find from the evidence presented at trial that the capital offense was especially heinous, atrocious and cruel compared to other capital offenses. This finding is based upon the evidence that the victim was repeatedly kicked, stomped and beaten, tied to a tree with the rope around his neck, and run over by his own taxi cab. The evidence indicates that at not time did the victim ever resist or fight back. The conclusion of the Court as to the heinous, atrocious or cruel nature of the offense is made after a careful review of all the evidence and after considering the totality of the circumstances of this case.

MITIGATING CIRCUMSTANCES ENUMERATED AND OTHERWISE PRESENTED
The evidence does indicate that the defendant has a significant history of prior *1321 criminal activity, including two convictions for robbery.
The preponderance of the evidence does not show that defendant was under the influence of extreme mental or emotional disturbance at the time of the capital offense.
The preponderance of the evidence establishes that the victim, Elbert Lee Jackson, was not a participant in the defendant's conduct, and the preponderance of the evidence further establishes that the victim did not consent to the defendant's conduct.
The evidence establishes that the defendant was a major participant in the capital offense.
The preponderance of the evidence establishes that the defendant was not under extreme duress at the time of the capital offense.
The preponderance of the evidence further establishes that the defendant was not under the substantial domination of another person.
The Court determines from a preponderance of the evidence presented that Thomas Floyd, Jr., did have the capacity to appreciate the criminality of his conduct and finds no indication that this capacity was impaired.
The evidence indicates that the defendant was twenty-five years of age at the time of the capital offense.
Defendant waived his right to a sentence hearing before a jury.
This Court finds in addition to the above mitigating circumstances that Thomas Floyd, Jr., cooperated with the State and testified at the trials of his co-defendants.

CONCLUSION
All of the proper evidence being received and arguments given, the Court has weighed each individual aggravating circumstance as it applies to Thomas Floyd, Jr., and has weighed such aggravating circumstances collectively. The Court has weighed each mitigating circumstance individually, and has weighed the mitigating circumstances collectively.
Upon due consideration, it is this Court's opinion that the aggravating circumstances taken individually or collectively outweigh the mitigating circumstances. It is, therefore, this Court's decision that the death penalty be imposed upon Thomas Floyd, Jr.
Done this the 30th day of November, 1984.
 /s/ H. Randall Thomas
 H. RANDALL THOMAS
 Circuit Judge
NOTES
[1] For an example of an instance wherein the State should have been required to elect between two counts, one charging the appellant with capital murder under § 13A-5-31(a)(4) and the other charging capital murder under § 13A-5-31(a)(10), see Duncan v. State, 436 So.2d 883 (Ala.Cr.App.1983).
[1] A listing of convictions for which a sentence of death was imposed under Alabama's death penalty statute. In Beck the Alabama Supreme Court noted that of the fifty cases it studied, thirty-three were robbery-intentional killing cases.
[2] Samuel Lee Felder was convicted of the intentional killing of Elbert Lee Jackson during the course of a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975, and sentenced to death. Felder v. State, 470 So.2d 1321 (Ala.Crim.App.1984), aff'd, 470 So.2d 1330 (Ala.1985); Gregory Acres was convicted of the intentional killing of Elbert Lee Jackson during the course of a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975, and sentenced to death. Acres v. State, CC 82-1771 [3 Div. 843, notice of appeal filed, June 3, 1983].